**In re Dennis Allen CROSBY and Bobby Jo Crosby, Debtors.**

**In re Racheal Lea Petersen, Debtor.**

**Nos. 00–40270–13, 00–41301–13.**

United States Bankruptcy Court, D. Kansas.

Jan. 22, 2001.

Fred W. Schwinn, Consumer Law Center, P.A., Topeka, KS, for debtors.

Wayne E. Hundley, James S. Willard, Tanya Sue Wilson, Office of United States Attorney, Topeka, KS, for creditors.

## MEMORANDUM OF DECISION ON DEBTORS' OBJECTIONS TO CLAIMS

JAMES A. PUSATERI, Chief Judge.

These matters are before the Court for resolution of the debtors' objections to the claims of Community America Credit Union. Debtors Dennis Allen Crosby, Bobby Jo Crosby, and Racheal Lea Petersen all appear by counsel Fred W. Schwinn. Community America Credit Union appears in both cases by counsel James S. Willard. The Court has reviewed the relevant materials and is now ready to rule.

### FACTS

*1. Crosby*

In December 1993, debtor Bobby Jo Crosby ("Ms. Crosby") entered into a "Loanliner Credit Agreement" with the Santa Fe Credit Union, the predecessor to Community America Credit Union (collectively, "the Credit Union"). In August 1994, Ms. Crosby signed the last of a series of loan documents, and pledged her car as security for a loan balance of $7,552.95. Ms. Crosby eventually defaulted. The Credit Union repossessed the car and sold it in February 1995, but the sale left a deficiency of over $5,000. In June 1995, the Credit Union filed a petition against Ms. Crosby in state court, seeking about $5,800, plus pre- and post-judgment interest. The next month, the state court rendered a default judgment for the Credit Union.

Sometime in 1995 or early 1996, the Credit Union caused a "Form 1099–C, Cancellation of Debt," to be filed with the Internal Revenue Service. The 1099–C stated that a debt owed by Bobby J. Crosby had been canceled. The amount of the canceled debt was stated to be $6,174.48, including interest of $521.81. Comparing this amount to the amount of the judgment indicates that the form was completed after the judgment was entered in July. As required by IRS regulations, the Credit Union sent a copy of the form to Ms. Crosby. A copy of her copy has been supplied to the Court. The Crosbys allege that they included the canceled debt in their gross income on their 1995 federal and state tax returns, but the Credit Union complains there is no evidence to support this assertion.

Despite having sent the 1099–C to the IRS and without correcting the form to indicate that it had not discharged the debt, the Credit Union continued to try to collect on the judgment against Ms. Crosby. It was unable to locate her for a substantial period of time, but eventually located her employer and commenced wage garnishment proceedings against her in September 1999. Three garnishments successfully obtained some of Ms. Crosby's wages for the Credit Union. One more also attached some of her wages, but it was released, apparently because the Crosbys filed for bankruptcy before the garnished money was paid into court. The docket from the state court indicates notices sent to Ms. Crosby about the garnishment were returned undeliverable, so she probably did not have actual notice in time to reply to any of the garnishee's answers, unless the garnishee informed

her of the garnishments. In any event, she did not respond to any of the garnishments until her bankruptcy attorney sent a notice of automatic stay to the Credit Union's attorney.

The Credit Union filed a proof of claim in the Crosbys' bankruptcy case, and they objected to it.

### 2. Petersen

In 1994, debtor Racheal Lea Petersen ("Ms. Petersen") renewed a debt to the Credit Union of about $940. According to the IRS's records, sometime before the end of January 1996, the Credit Union filed a 1099–C with the IRS indicating that during the 1995 tax year, it had canceled Ms. Petersen's debt of $1,075, including $135 in interest. Presumably, the Credit Union also sent the required copy to Ms. Petersen.

Despite having sent the 1099–C to the IRS and without correcting the form to indicate that it had not discharged the debt, the Credit Union sued Ms. Petersen in state court in September 1995, seeking to recover the debt, plus pre- and post-judgment interest. Summons was purportedly served on Ms. Petersen the following April by leaving it at her residence with her mother-in-law, but she filed no answer. A default judgment was entered in May 1996. It recited that valid residential service of process was had on Ms. Petersen.

The Credit Union apparently could not locate Ms. Petersen for a substantial period of time, but eventually located either her employer or some of her property and commenced garnishment proceedings late in 1999. According to the docket from the state court, three successful garnishments obtained about $1,240. Notices of these garnishments that were sent to Ms. Petersen appear to have been returned undeliverable. A fourth garnishment attached almost $170 and an order to pay was issued to the garnishee on the day Ms. Petersen filed for bankruptcy; apparently the Credit Union released that garnishment. Ms. Petersen did not respond to any of the garnishments until her attorney filed a notice of bankruptcy with the state court.

The Credit Union filed a proof of claim in Ms. Petersen's bankruptcy case for about $370, and she objected to it.

### 3. Form 1099–C

The copy of Ms. Crosby's 1099–C discloses that the form explains various matters to educate the debtor about the form's function. The 1099–C indicates that the information it contains is being furnished to the Internal Revenue Service, and that sanctions might be imposed on the debtor if the information results in taxable income and the IRS determines the debtor has not reported it. The form also instructs that an individual must generally include the amount of the canceled debt in income on his or her federal income tax return. The form indicates that the canceled debt could be excluded from income to the extent the debtor is insolvent, but that an additional form is to be filed with the tax return if this exclusion is claimed. There is a box labeled "Corrected (if checked)" at the top of the form, indicating the Credit Union could submit another copy of the form to fix any errors the first one contained. An order that the Credit Union's counsel had prepared for entry by a state court judge in a case not involving any of these debtors stated that the Credit Union had filed a corrected 1099–C for the debtor involved there, so the Credit Union seems to have been aware at some time that it could rectify an erroneous filing of the form.

## DISCUSSION AND CONCLUSIONS

The parties briefed several issues in the Crosbys' case, and both sides have adopted

their arguments for Ms. Petersen's case. The Credit Union raised another issue in Ms. Petersen's case that affects only her, and the parties have also briefed that question. The Court will first consider the arguments that apply to both cases, and then consider the ones unique to Ms. Petersen's.

As relevant to these disputes, 11 U.S.C.A. § 502(b)(1) provides that, on objection, the Court is to disallow a claim that "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." Section 6050P of the federal Internal Revenue Code states in pertinent part that a financial entity like the Credit Union "which discharges (in whole or in part) the indebtedness of any person during the calendar year shall make a return (at such time and in such form as the Secretary may by regulations prescribe)." 26 U.S.C.A. § 6050P(a). Such a discharge of indebtedness generally constitutes income that is included in the debtor's gross income for federal income tax purposes, 26 U.S.C.A. § 61(a)(12), although it is not included under certain circumstances, *see* 26 U.S.C.A. § 108(a)(1). The IRS has passed regulations requiring a discharge of indebtedness covered by § 6050P to be reported on Form 1099–C. *See* 26 C.F.R. § 1.6050P–1T (1995) (*removed eff.* Dec. 22, 1996 *at* 61 Fed.Reg. 262, 271 ¶ 3); 26 C.F.R. § 1.6050P–1 (2000). As indicated, Form 1099–C told the debtors that the discharge of indebtedness was to be reported on their federal income tax returns, and that the amounts discharged would ordinarily be included in their gross income.

■ The Credit Union asserts that it "believed the IRS required the report at the time when regulatory provisions required the removal of the unpaid debt to a

non-asset status." This seems to be referring to some bookkeeping entry that the Credit Union was required to make. In essence, the Credit Union contends that it filed the 1099–C's with the IRS under a mistaken interpretation of the agency's regulations, and that its mistake does not affect its right to collect from the debtors, even though it has made no effort to file corrected 1099–C's so that the error does not affect either debtor's 1995 tax liability. The Court cannot agree. The Credit Union's filing of the 1099–C's was analogous to assigning the debts to the IRS, necessarily passing to the IRS any right to collect money from the debtors on account of the debts. Without the forms, the debtors would not have had to report the discharge of indebtedness income to the IRS and pay tax on it, as Ms. Crosby, at least, claims she did. Even if the debtors did not report the income and pay the tax, or reported it and claimed an exclusion under 26 U.S.C.A. § 108(a)(1), the IRS could audit their returns and, because of the 1099–C's, possibly impose additional tax and penalties. The actual (or at least potential) tax consequences of the form make it inequitable to allow the Credit Union to enforce its claims against the debtors. Until the Credit Union corrects or withdraws the 1099–C it mistakenly filed about each debtor, it cannot enforce its claim against that debtor, just as it would have no right to do so if it had assigned the debt and not undone the assignment.

The IRS regulations implementing § 6050P make clear that the Credit Union could not properly report the debt as discharged on a 1099–C while continuing its collection efforts. The parties have pointed to 26 C.F.R. § 1.6050P–1 (2000) as the applicable regulation. It provides that an entity like the Credit Union:

that discharges an indebtedness of any person ... during a calendar year must

file an information return on Form 1099–C with the Internal Revenue Service. Solely for purposes of the reporting requirements of section 6050P and this section, a discharge of indebtedness is deemed to have occurred ... if and only if there has occurred an identifiable event described in paragraph (b)(2) of this section, whether or not an actual discharge of indebtedness has occurred on or before the date on which the identifiable event has occurred.

§ 1.6050P–1(a)(1). Eight "identifiable events" are specified in paragraph (b)(2) of the regulation. Six of them involve situations such as a discharge or cancellation of the debt in bankruptcy or other court proceedings, the expiration of the statute of limitations, an election of remedies, or an agreement. § 1.6050P–1(b)(2)(i)(A) through (F). These situations exist only when the creditor is legally barred from collecting the debt. The seventh identifiable event involves the creditor's decision or the application of its defined policy "to discontinue collection activity and discharge debt." § 1.6050P–1(b)(2)(i)(G). The eighth involves the expiration of a non-payment testing period, although the period does not expire if the creditor engages in "significant, bona fide collection activity" or other circumstances indicate the debt has not been discharged. § 1.6050P–1(b)(2)(i)(H) & (b)(2)(iv). The regulation also provides that no identifiable event under paragraph (b)(2)(i)(H) can occur before December 31, 1997. § 1.6050P–1(b)(iv)(C). Thus, under this regulation, for the 1995 calendar tax year, the one covered by the 1099–C's that the Credit Union submitted to the IRS, the form told the debtors and the IRS that the Credit Union either thought that it was legally barred from collecting the debts or had decided to discharge the debts. In either situation, Ms. Crosby's and Ms. Pet-

ersen's income tax liabilities were to be computed accordingly.

In fact, with limited exceptions not involved here, a different, temporary regulation actually applied to discharges of indebtedness during the 1995 calendar year. *See* 26 C.F.R. § 1.6050P–1T (1995) (*removed eff.* Dec. 22, 1996, *at* 61 Fed.Reg. 262, 271 ¶ 3); *see also* 26 C.F.R. § 1.6050P–1(h) (2000) (regulation generally applies to discharges of indebtedness after December 21, 1996, although creditor has option to apply it to ones occurring as early as January 1, 1996). Similar to the later regulation, § 1.6050P–1T(a)(1) required an entity like the Credit Union to report to the IRS when it discharged an indebtedness. Paragraph (b)(1) of the regulation provided that "indebtedness will be considered discharged upon the occurrence of an identifiable event indicating that the indebtedness will never have to be paid by the debtor, taking into account all the facts and circumstances." Paragraph (b)(2)(i) listed three "identifiable events" but indicated the list was not exclusive. Paragraph (b)(2)(ii) stated that a bookkeeping entry alone was not an "identifiable event" but was one of the facts and circumstances to be considered in determining whether a discharge had occurred. Paragraph (b)(3) indicated that collection activity was also one of those facts and circumstances. Under this regulation, the forms told the debtors and the IRS that the Credit Union thought the debtors would never have to pay the debts, and that they should calculate Ms. Crosby's and Ms. Petersen's tax liabilities accordingly. So long as a 1099–C filed pursuant to this regulation remains in effect for either debtor, the Credit Union should not be permitted to enforce its claim against that debtor because of the form's impact on the debtor's 1995 taxes.

■ In the Crosbys' case, the Credit Union obtained its judgment before it filed the 1099–C, so the form indicated the Credit Union had discharged the judgment. Later, however, the Credit Union successfully garnished Ms. Crosby's wages. In Ms. Petersen's case, the Credit Union obtained its judgment after it filed the 1099–C, and then successfully garnished some of her wages or other property. In each case, the Credit Union suggests the subsequent garnishment judgments should preclude the debtor from relying on the 1099–C as a defense to its claim. Again, the Court cannot agree. The *Restatement (Second) of Judgments 2d*, in a section entitled "Judgments in actions based on attachment jurisdiction," describes rules of preclusion for *quasi in rem* proceedings like garnishments:

> A valid and final judgment begun by attachment, garnishment, or similar process (traditionally described as "quasi in rem") in which jurisdiction is exercised only with respect to the thing proceeded against and in which the plaintiff seeks not to determine the existence of interests in the thing but rather to apply the thing to the satisfaction of a claim against the defendant:
>
> (1) Is conclusive between parties as to the right to apply the thing to the claim; and
>
> (2) Does not bind the defendant to any personal liability, or determine the defendant's interest in any other thing; and
>
> (3) Is conclusive between the parties, in accordance with the rules of issue preclusion, as to any issues actually litigated by them and determined in the action.

*Restatement (Second) of Judgments 2d,* § 32 (1980). Under Kansas law, a garnishment action seeking to apply property to a debt not related to the property is premised on *quasi in rem* jurisdiction, and a garnishment judgment does not bar the creditor from bringing a later action to seek further recovery from the debtor on the same claim. *Riverview State Bank v. Dreyer,* 188 Kan. 270, 273, 362 P.2d 55 (1961). Similarly, the garnishment judgment should not bar the debtor from asserting in a later action a defense that was available but not asserted in the earlier garnishment. *See Restatement (Second) of Judgments 2d,* § 32 at 329, comment c, illus. 2 (giving an example of this effect of the rules stated in § 32). This is particularly so if, as appears may be true in both these cases, the judgment debtor did not receive timely notice of the garnishment. In any event, neither Ms. Crosby nor Ms. Petersen appeared in any of the earlier garnishment proceedings, and so could not have actually litigated her defense based on the 1099–C. Under the rules described in the Restatement, the Credit Union's garnishment judgments determined only its right to apply the garnished money to its judgments, not the debtors' rights to raise the 1099–C discharge as a defense in any later proceedings.

■ In Ms. Petersen's case, the Credit Union presses another argument not available in the Crosbys' case: it obtained the judgment on her debt to it after it filed the 1099–C with the IRS, and therefore, *res judicata* precludes her from relying on the 1099–C as a defense to the judgment. Unlike the garnishment actions, the Credit Union's money judgment was based on personal or *in personam* jurisdiction over Ms. Petersen. Under Kansas law, jurisdiction over the person of a defendant can be acquired only by the issuance and service of process in a manner prescribed by statute, or by the defendant's voluntary appearance. *Haley v. Hershberger,* 207 Kan. 459, 463, 485 P.2d 1321 (1971). For a

limited actions proceeding like that brought against Ms. Petersen, K.S.A. 61-1803(c)(1) authorizes service of process to be made "by leaving a copy of the process and petition ... at the dwelling house or usual place of abode of the person to be served with some person of suitable age and discretion residing therein." That is the type of service made on Ms. Petersen. Federal Rule of Civil Procedure 4(e)(2) includes a similar provision. Such service satisfies the constitutional due process requirement that the defendant is entitled to notice and an opportunity to be heard. *See* 4 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Pro.: Civil 2d*, § 1074 at 459 (1987); *McDonald v. Mabee*, 243 U.S. 90, 92, 37 S.Ct. 343, 61 L.Ed. 608 (1917) (suggesting service by leaving summons with defendant's family at his last and usual place of abode before he left state intending to establish new domicile was least effective method of service that might have obtained personal jurisdiction over him; holding publication service was insufficient to do so); *see also Mullane v. Central Hanover Bank and Trust*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (for proceeding to be accorded finality, due process requires notice reasonably calculated under circumstances to apprise interested parties of pendency of action and afford them opportunity to be heard).

■ Under Kansas law, when a court has jurisdiction of the parties and the subject matter of the action, even a judgment entered by default because the defendant failed to answer is conclusive and may not be collaterally attacked. *Banister v. Carnes*, 9 Kan.App.2d 133, 138, 675 P.2d 906 (1983). Furthermore, under Kansas law, a defense that was available at the time of the prior action but not raised before entry of an adverse, *in personam* judgment is barred by either *res judicata* or collateral estoppel in later actions involving the same matters as the prior action. *Neville v. Hennigh*, 214 Kan. 681, 685-89, 522 P.2d 443 (1974). Consequently, despite this Court's view that it would not be equitable to allow the Credit Union to collect its debt from Ms. Petersen while the 1099-C remains in effect, her failure to assert a defense based on the 1099-C when the Credit Union sued her and obtained the default judgment precludes her from attacking its judgment based on the 1099-C. The Court may not now declare the Credit Union's judgment to be unenforceable and disallow it under § 502(b)(1).

■ However, under 11 U.S.C.A. § 510(c)(1), the Court may "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." Relying on this authority, the Court concludes that the Credit Union's claim against Ms. Petersen should be subordinated to all other allowed claims to the extent the claim was reported on the 1099-C to have been discharged.

For these reasons, the Court concludes that the Credit Union cannot enforce its claim against Ms. Crosby so long as the 1099-C it sent to the IRS remains in effect, and consequently, that claim must be disallowed pursuant to 11 U.S.C.A. § 502(b)(1). On the other hand, the Court concludes that the Credit Union can enforce its claim against Ms. Petersen because it obtained its judgment after it filed the 1099-C, and consequently, that claim cannot be disallowed pursuant to § 502(b)(1). The Court will, however, exercise its power under § 510(c)(1) to subordinate the Credit Union's claim against Ms. Petersen to all the other allowed claims in her case.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal

Rules of Civil Procedure. Judgments based on this ruling will be entered on separate documents as required by FRBP 9021 and FRCP 58.